# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STEVE BERNARD HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-1062 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## **O R D E R**

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#11] is DENIED, and the Commissioner's Motion to Affirm [#15] is GRANTED.

### BACKGROUND

Plaintiff, Steve Bernard Harvey ("Harvey"), was 45 years' old at the time of his administrative hearing. (R34) He completed high school and has one year of college education. (R40) He is unmarried and has six children but lives with his brother. (R40, R53) He was last employed as an activities director for a children's camp.

Harvey had his left knee replaced in 2002, but still experienced pain; Vicodin and Tylenol did not do much to relieve his pain. (R42-43) He was also experiencing pain in his right knee as a result of arthritis and underwent arthroscopic surgery in 2007. (R44, R46) During his hearing,

Harvey stated that his pain never stops, even when sitting down. (R47) He takes Tylenol and Tramadol for pain, but does not require an assistive device to ambulate. (R200)

On a typical day, he wakes up several times during the night. He may go to bed at 10:30pm, get up at 2:00am and watch TV, go back to bed at 5:30am and doze before getting up for the day at 10:00 or 11:00am. (R48-49) Once he's up, he lays on the couch, sometimes with a heating pad. (R50) Harvey eats some cereal around 1:00pm before sitting back down for awhile. (R50-51) He watches TV until he has to walk a block to catch the bus to go to his former part-time position interacting with kids at the Carver Center. (R51) In this position, he pitched for kickball games and generally was on his feet for an hour of the three hours he was there. (R52) After work, Harvey caught the bus home, showered, got right in bed and watched a movie. (R53) His children's mother cooks for him or brings him something to eat. *Id.*

Harvey does not own or drive a car. (R55) He can go up and down the six stairs that lead to the room he stays in at his brother's house. *Id.* He can walk or stand for about 20 minutes at a time before needing to sit and can sit for an hour at a time. (R52, R56) Harvey stated that he can lift a gallon of milk and carry it across the room and back. (R56-57) Although his medications make him drowsy when he takes them, he does not have any trouble following the TV programs that he watches or paying attention while he is awake. (R59-60)

In May 2007, Harvey applied for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability that began on September 2004. His application was denied both initially and on reconsideration. Harvey requested a hearing before an administrative law judge ("ALJ"). A hearing was held before ALJ Diane Raese Flebbe on September 16, 2009, at

which Harvey, who appeared pro se, and vocational expert ("VE") Malik appeared and gave testimony.

The ALJ posed a hypothetical question to the VE:

> Q: I would like you to assume the following limitations. The ability to life and carry 20 pounds occasionally and 10 pounds frequently, stand and walk six hours a day, sit six hours a day. Occasionally climb ramps, stairs, ladders, ropes, scaffolding, occasionally balance, stoop, kneel, crouch, crawl. With such limitations would Mr. Harvey be able to perform any past work?
>
> A: With that hypothetical, Your Honor, the claimant could return to the past duties of an activity director or bus monitor and the child care teacher.
>
> Q: Okay. Now I would like you to please assume the ability to life and carry 10 pounds occasionally, five pounds frequently, stand and walk two hours a day, sit six hours a day. Occasionally climb ramps and stairs, occasionally balance, stoop and crouch but not climb ladders, ropes, scaffolding. No kneeling, no crawling, no operating foot controls, no work at unprotected heights. Does that change your answer about any past work?
>
> A: That would eliminate the past work, Your Honor.
>
> Q: Okay. Would a hypothetical individual of Mr. Harvey's age, education and vocational background with such limitations be able to perform other work?
>
> A: Yes, Your Honor. At the sedentary level we would have DOT 209.687-022.
>
> Q: I'm sorry, 209.6?
>
> A: 209.687-022 –
>
> Q: Okay.
>
> A:  – a sorter –
>
> Q: Okay.

A: – 34,500 in Illinois, 851,800 in the national economy.

Q: Okay.

A: There are two cashiering positions –

Q: Okay.

A: DOT 211.482-014, there are 10,100 in Illinois, 249,100 in the national economy.

Q: Um-hum.

A: The other cashier is 21..482-010, 9,100 in Illinois, 222,100 in the national economy.

Q: Okay.

A: Those are representative, Your Honor.

Q: Okay. If one were to modify those restrictions a little bit just by specifying that standing and walking was limited to 20 minutes at a time for two hours a day, sitting was limited to 60 minutes at a time for six hours a day and the maximum life and carry was eight pounds rather than 10. Would that change the answer?

A: No, ma'am.

Q: If we were to add to that due to the effects of medication limitations to understanding, remembering and carrying out work instructions that can be learned in less than 30 days. Also no operating dangerous machinery or a motor vehicle, again secondary to side effects from medication. Would that change your answer?

A: Yes, ma'am.

Q: Okay.

A: It would give me a different group that I would have to –

Q: Were those other jobs you gave SVP 2 jobs?

A: They're all SVP 3, Your Honor.

> Q: Threes, okay.
>
> A: These would be SVP 2.
>
> Q: Okay.
>
> A: DOT 249.587-018, a document preparation clerk, 2,200 in Illinois, 31,900 in the national economy.
>
> Q: Okay.
>
> A: DOT 249.587-014, a pay stub clerk, 1,900 in Illinois, 26,200 in the national economy.
>
> Q: Okay.
>
> A: DOT 209.587-010, an addresser, 2,200 in Illinois, 91,300 in the national economy. DOT 726.684-010, touch up worker, 2,700 in Illinois, 56,900 in the national economy. This would be representative, Your Honor.
>
> Q: Okay. If one required, I'd like to add this, the need to place a pillow under the knee while doing the sitting work, would that change these?
>
> A: No, Your Honor.
>
> Q: If – well I guess again it doesn't matter but secondary to pain and side effects from medication one were to miss work more than two days a month would that change your answer?
>
> A: That would eliminate all jobs, Your Honor.
>
> Q: Likewise if one were able to attend work regularly but required additional breaks of up to at least an hour a day secondary to pain, would that change your answer?
>
> A: No, it would eliminate all jobs, Your Honor.

(R61-64)

On November 4, 2009, the ALJ issued her decision. (R8) The ALJ found that Harvey has severe impairments that have been diagnosed as bilateral knee arthritis, status post left knee

replacement and right knee arthroscopy. (R13) The ALJ determined, however, that Harvey does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR Part 404, Subpart P, Appendix 1. (R14)

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Harvey retained the residual functional capacity ("RFC") to life and carry eight pounds occasionally and five pounds frequently, stand and walk twenty minutes at a time for a total of two hours a day and sit sixty minutes at a time for a total of six hours a day with the option to have a pillow under his knee while sitting; he is limited to no climbing of ladders, ropes or scaffolds, no kneeling, crawling, operating foot controls or working at unprotected heights; he is limited to only occasional climbing of ramps and stairs, balancing, stooping and crouching; due to the reported pain and side effects from medication, he is further limited to understanding, remembering and carrying out work instructions learned in less than 30 days; he is unable to operate dangerous machinery or a motor vehicle. (R14) The ALJ concluded that Harvey's medically determinable impairments could reasonably be expected to produce pain and other alleged symptoms. Id. However, his assertions regarding the intensity, persistence, and limiting effects of the symptoms were found to be not credible to the extent that they are not substantiated by objective medical evidence or consistent with the RFC assessment. (R15-17)

Past relevant work was excluded. (R19) Based on a consideration of his age, education, work experience, and residual functional capacity, the ALJ concluded that although Harvey's ability to perform work on all exertional levels has been compromised by limitations, the testimony of the VE established that he was capable of making a successful adjustment to work that exists in

significant numbers in the national economy and that he was not under a disability as defined under the Social Security Act at any time since his alleged onset. (R20)

Harvey submitted a Request for Review of Hearing Decision. On January 21, 2011, the Appeals Council declined review of his claim, and the ALJ's decision became the final decision of the Commissioner. (R1-3) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to SSI and/or DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20

C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v.

Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Harvey argues that his impairments have become significantly worse following the ALJ's decision, and he is now in constant pain. The Commissioner correctly notes that while this change in condition may support a new application for benefits, the relevant time frame is the time the ALJ made her decision based on the evidence of record available to her. In fact, Harvey does not actually challenge the findings of the ALJ as of the time she issued her decision, and his appeal in this case is therefore without merit.

The ALJ methodically considered and largely credited the opinions of the treating physicians. Harvey does not specifically dispute these findings. Harvey began receiving treatment for pain in his left knee in 2001. In April 2002, Dr. Michael Merkley performed a debridement on his knee after opining that Harvey was too young for knee replacement. In July 2002, he was evaluated by Dr. Thomas Mulvey for joint reconstruction. However, Harvey ultimately underwent a knee replacement on September 20, 2002. Following the surgery, he showed steady progress, participated in physical therapy three times a week, and was cautioned against over-activity. In October 2003, Dr. Mulvey noted that Harvey was doing well, with excellent motion, good stability, and good alignment of his knee replacement. When Harvey returned to Dr. Mulvey in November 2004, he had stability and range of motion within normal limits and was told to use a knee brace during times of increased activity, avoid twisting, turning, or impact activity, and to begin a therapy program. In January 2005, Dr. Mulvey observed that Harvey had improved after therapy and recommended that the therapy continue. Despite complaints of "tooth ache" type pain in May and June 2005, Dr. Mulvey observed that the knee

had good alignment and no evidence of fracture, loosening, or infection; Dr. Mulvey assured Harvey that his knee appeared to be well fixed and that he needed to maintain appropriate activity.

In June 2007, Harvey say Dr. Mulvey for pain in his right knee. Harvey was diagnosed with minimal arthritic change but overall good joint space preservation. An MRI showed that his right knee had a tear of the meniscus, Grade III chondromalacia, and synovial osteochondromatosis. The left knee replacement was noted as doing well overall.

Consultative Examiner Donald Habecker examined Harvey in August 2007 at the request of the state agency. Harvey advised that his left knee was somewhat better following the replacement but that his right knee pain was worse that the left. He admitted that he could walk a block, stand without a problem, and that he held onto a railing when he used stairs. Dr. Habecker observed a decreased range of motion in both knees, but a normal gait and no sensory deficits. Harvey was diagnosed with osteoarthritis of both knees, showed mild problems getting on and off the table, moderate problems squatting and rising from a squat, and an inability to hop on his left leg.

On September 11, 2007, Dr. Sandra Bilinsky reviewed the record and determined that Harvey could lift/carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk for a total of about six hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and push/pull without limitation. Dr. Bilinsky found no postural, manipulative, visual, communicative, or environmental limitations and opined that Harvey could perform the full range of light work.

In October 2007, Harvey complained of increased right knee pain, as well as increased discomfort beginning on his left knee. He underwent a right knee arthroscopy and partial lateral meniscectomy. By November 2007, the swelling had gone down and Harvey was getting around okay without any assistive device. Dr. Mulvey's office stated that he could "hopefully" return to work after six weeks and could definitely not return to work until his next appointment in four weeks. On November 29, 2007, Dr. Delano Zimmerman reviewed the file and, with the exception of some occasional postural limitations, reached the same conclusions regarding Harvey's RFC as Dr. Bilinsky.

In January 2008, Dr. Mulvey recommended a formal therapy program in response to Harvey's report of discomfort in his right knee. Dr. Mulvey stated that Harvey would be unable to work until his next appointment in six weeks. In March 2008, Harvey reported no pain in either knee and demonstrated full range of motion, normal gait, and no direct pain. He discontinued pain medication until he reported pain in his right knee following a long day of activity in mid-April 2008. At the end of April 2008, Dr. Mulvey noted that Harvey had improved with physical therapy and that his left knee was doing well. He recommended that Harvey see a rheumatologist and stated that Harvey was unable to work until further notice.

In August 2008, Dr. Mark Getz, a rheumatologist, observed that Harvey was not taking any medication and had no tender joints. It was determined that only conservative measures could be offered, such as acupuncture, water exercise, and massage. In November 2008, Harvey was released to light duty work. He was not taking any medications for pain at that time.

In February 2009, Harvey had returned to work as the children's activities director part-time and was tolerating it reasonably well. In April 2009, Dr. Timothy Michals noted that

Harvey was currently without complaint and experienced no side effects from his medications. In May 2009, Harvey had crackling in his knees but an otherwise unremarkable joint examination. It was recommended that he receive job retraining so that he could find a job where he could be more sedentary. In September 2009, Harvey asked to be referred back to Dr. Mulvey for possible replacement of his right knee. He received a steroid injection and the referral, but as of the date of the ALJ's decision, the replacement had not been performed.

This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record. Rather, the medical records simply failed to compel the conclusion that Harvey was disabled within the meaning of the Act at the time relevant to this application. Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#11] is DENIED, and the Commissioner's Motion to Affirm [#15] is GRANTED. This matter is now terminated.

ENTERED this 30th day of July, 2012.

                                              s/ James E. Shadid
                                              James E. Shadid
                                              United States District Judge